**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA**,

    Plaintiff,

vs.                                                                                                  No. **CR 03-1099 MCA**

**TROY CHAVEZ**,

    Defendant.

**MEMORANDUM OPINION AND ORDER
GRANTING DEFENDANT'S MOTION TO SUPPRESS**

**THIS MATTER** came before the Court on *Defendant's Motion to Suppress* [Doc. No. 13] filed on July 31, 2003.  The Government was granted an extension of time to respond to Defendant's motion [Doc. No. 17], and the Court held an evidentiary hearing on the motion in Albuquerque, New Mexico, on September 9, 2003 [Doc. No. 22].  Having fully considered the pleadings of record, the applicable law, the evidence and the arguments of counsel presented at the hearing, and being fully advised in the premises, the Court grants Defendant's motion based upon the following findings of fact and conclusions of law.

**I.    FINDINGS OF FACT**

1.    At approximately 6:15 a.m. on March 14, 2003, a team of four uniformed police officers attended a fifteen-minute briefing conducted by a detective in Socorro, New Mexico, regarding the execution of a warrant for Defendant's arrest on a charge of trafficking cocaine.

2.	During the briefing, the officers were informed that Defendant was an adult who resided with his grandparents and maintained a separate bedroom in the residence owned by his grandparents.

3.	At the briefing, the officers were specifically advised that Defendant maintained a separate bedroom in the house, that he alone could access, and that it could not be searched without a warrant or a valid consent.

4.	Defendant's bedroom door is secured by a lock, which only Defendant has access to.

5.	The officers were not informed of the specific factual basis for the arrest warrant, such as the date on which Defendant was last seen trafficking cocaine, who saw him trafficking cocaine, or the circumstances of such trafficking.

6.	Although the arrest warrant was based solely on a charge of trafficking cocaine, the detective conducting the briefing also informed one of the officers (Sergeant Montano) of a suspicion that Defendant might have stolen an antique, Civil-war era shotgun.

7.	There is no evidence that any of the officers were informed of the basis for the detective's suspicion regarding the shotgun.

8.	No search warrant was obtained in conjunction with the arrest warrant, and there is no evidence that a plan for obtaining a search warrant was discussed by the officers at the briefing or thereafter.

9.    Immediately after receiving the briefing, the four officers converged on the residence of Defendant and his grandparents in Socorro, New Mexico, to execute the warrant for Defendant's arrest.

10.   During the arrest, questioning, and searches that ensued, the four officers were uniformed and armed, but they did not draw their weapons.

11.   Officer Luis Chavez of the Socorro Police Department and a New Mexico State Police officer approached the kitchen entrance to the residence and knocked on the door at that location.

12.   Meanwhile, Sergeant Laurence Montano of the Socorro Police Department and another New Mexico State Police officer waited outside the front door of the residence.

13.   Defendant's grandmother, Ester Chavez, responded to the knock at the kitchen door. When she arrived at the door, Officer Luis Chavez informed her that he had a warrant for Defendant's arrest. Defendant's grandmother responded by opening the door and stepping aside to allow the officers to enter the residence.

14.   Defendant and his grandfather, Federico L. Chavez, heard the officer at the kitchen door and came out of their respective bedrooms.

15.   After Defendant exited his bedroom, Officer Luis Chavez saw him, informed him of the arrest warrant, and placed him under arrest in the kitchen area without a struggle.

16.   Within a matter of seconds after Defendant was placed under arrest, Sergeant Montano entered the kitchen door of the residence and assumed control of the scene.

17. The officers' communications with Defendant and his grandparents were conducted in English and were understood by all concerned.

18. Sergeant Montano proceeded to read Defendant his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), using an "advice of rights" form prepared for that purpose. (Ex. 3.)

19. Defendant signed the "advice of rights" form indicating that he understood his <u>Miranda</u> rights and voluntarily elected to waive those rights by talking to the officers after he was placed under arrest.

20. After Defendant signed the "advice of rights" form, Sergeant Montano asked Defendant for consent to search his bedroom. Defendant responded by asking: "What if I say no?" Sergeant Montano replied: "Then we can't search it."

21. Defendant refused to consent to a search of his bedroom in response to this initial questioning by Sergeant Montano that occurred in the kitchen of the residence.

22. After Defendant's initial refusal to consent to this search, Sergeant Montano proceeded to hand Defendant's grandparents a consent form and ask them if they would consent to a search of their residence. (Ex. 1.)

23. When Sergeant Montano posed this question to Defendant's grandparents, Defendant turned toward them and shook his head from side to side to suggest that they should answer "no."

24. Despite this gesture, Defendant's grandfather began filling out the consent form.

25.     During this time, the elderly grandmother became ill and the officers, Defendant, and the grandfather all believed that she was having a heart attack. An ambulance was called to the residence, and Defendant's grandfather retrieved some medication and a glass of water for her.

26.     As the officers were in the process of obtaining consent from Defendant's grandparents, Sergeant Montano removed Defendant from the residence and placed him in the back seat of a marked police vehicle so as to prevent him from further communicating with his grandparents.

27.     Although his focus was on his spouse's medical condition and his grandson's arrest, Defendant's grandfather continued to complete and sign the consent form. (Ex. 1.)

28.     Within a few minutes, Sergeant Montano returned to the kitchen of the residence and directed the other officers to begin searching the interior of the residence (except for Defendant's bedroom) after Defendant's grandfather signed the consent form. The other officers complied with this instruction.

29.     Sergeant Montano remained in the residence for approximately ten minutes and then returned to the police vehicle in which Defendant was being detained.

30.     While standing inside the door to the police vehicle, Sergeant Montano announced to Defendant: "We are going to search the house."

31.     Sergeant Montano already knew that the other officers had begun to search the house (except for Defendant's bedroom) at the time he made this statement.

32. Defendant already knew that the officers had sought consent to search the residence from his grandparents at the time Sergeant Montano made this statement.

33. Taken in context, Sergeant Montano's statement that "we are going to search the house" was intended and understood to mean that the officers were going to search the entire house (including Defendant's bedroom) and that they claimed to have the legal authority to do so.

34. Immediately after he announced that "we're going to search the house," Sergeant Montano asked Defendant, "Are we going to find anything inside your bedroom?" Defendant responded: "Coke."

35. Based upon his training and experience, Sergeant Montano understood the word "coke" to mean "cocaine." He then asked about the location of the cocaine. Defendant responded that the cocaine was in his bedroom.

36. After hearing Defendant's responses to these questions, Sergeant Montano did not say anything to Defendant or the other officers about obtaining a search warrant for Defendant's bedroom.

37. Instead, Sergeant Montano restated his request for Defendant's consent to search his bedroom.

38. Defendant acquiesced to this second request for consent to search, stating that he "might as well" consent to the search because the officers "were going to find it anyway."

39. After receiving Defendant's oral consent to the search of his bedroom, Sergeant Montano brought Defendant out of the police car and removed his handcuffs.

40. Defendant was then given a written consent form, which he signed. (Ex. 2.)

41. After signing the consent form, Defendant remained unhandcuffed as he led the officers to the cocaine in his bedroom.

42. Accompanied by Sergeant Montano, Defendant entered his bedroom and pointed out a container located on top of some clothing in the closet of his bedroom.

43. Sergeant Montano then examined the contents of the container that Defendant identified and found a substance which, based on his training and experience, matched the description of "crack cocaine."

44. A further search of the bedroom revealed additional contraband and paraphernalia associated with drug trafficking.

45. Defendant credibly testified that he did not voluntarily consent to the search of his bedroom but merely acquiesced to Sergeant Montano's claim of lawful authority to conduct the search.

46. At no time during the officers' presence in the residence, and during conversations with Defendant, the grandfather, and grandmother, did any officer inquire as to the presence of firearms or weapons in the residence.

47. Sergeant Montano testified that his questioning about the contents of Defendant's bedroom was prompted by his concern for officer safety arising from the information he received at the briefing to the effect that Defendant was suspected of stealing an antique, Civil-war era shotgun. I do not find this particular testimony to be credible.

48. The Government presented no evidence at the suppression hearing that would justify a search of Defendant's bedroom based upon concerns about officer safety or other exigent circumstances.

49. Regardless of whether Sergeant Montano was concerned about finding guns or drugs during the search, the fact remains that his conversation with Defendant in the police vehicle was directed at a search of Defendant's bedroom and contained no limiting language to suggest otherwise.

50. Considering the totality of the circumstances, Defendant did not give his voluntary consent to search his bedroom.  Rather, Defendant complied with the officers' show of authority under the belief that he was powerless to stop the search and that the officers would help him if he cooperated and signed the consent form.

51. The officers' behavior corroborated Defendant's belief in this regard.  When he initially refused to consent, he was led by the arm from the residence in handcuffs and locked in the back seat of a police vehicle.  When he later acquiesced to Sergeant Montano's claim of lawful authority to search the house, he was unhandcuffed and allowed to walk back into the residence without any physical restraints by the officers.

52. Considering the totality of the circumstances, the evidence of criminal activity in Defendant's bedroom and the further statements given by Defendant after the officers entered his bedroom would not have been inevitably discovered by lawful means because there was never any effort or plan to obtain a search warrant based on Defendant's statements.

## II.  LEGAL ANALYSIS AND CONCLUSIONS OF LAW

The Fourth Amendment to the United States Constitution protects Defendant's right to be secure in his person and effects against unreasonable searches and seizures. In this case, it is not disputed that Defendant was lawfully seized by means of an arrest warrant. It is also not disputed that Defendant had a legitimate expectation of privacy in his bedroom and that the scope of his grandparents' consent to search the residence was limited such that it did not provide the officers with any legal justification for searching Defendant's bedroom.

The dispositive issue is whether the officers' warrantless search of Defendant's bedroom may be considered "reasonable" under the Fourth Amendment because Defendant consented to that search, or because the evidence found in his bedroom inevitably would have been discovered by other, lawful means. The Government bears the burden of proving by a preponderance of the evidence that one of these exceptions to the warrant requirement applies to this search. See United States v. Zubia-Melendez, 263 F.3d 1155, 1162 (10th Cir. 2001) (consensual searches); United States v. Souza, 223 F.3d 1197, 1203 (10th Cir. 2000) (inevitable discoveries). I conclude that the Government has not met this burden here, and therefore the fruits of the search must be suppressed pursuant to the exclusionary rule.

### A.  The Consensual Search Exception

I first consider the exception to the warrant requirement for consensual searches. "Whether voluntary consent was given is a question of fact, determined by the totality of the circumstances and reviewed for clear error." Zubia-Melendez, 263 F.3d at 1162. To meet its burden of proving that Defendant's consent was voluntary, the Government must present

clear and positive testimony that consent was unequivocal and specific and freely given without implied or express duress or coercion. See id. "This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968); accord Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 329 (1979); United States v. Leary, 846 F.2d 592, 598 (10th Cir. 1988).

Determination of the voluntariness of Defendant's consent requires careful attention to the particular context in which the alleged statements of consent are made. See generally Schneckloth v. Bustamonte, 412 U.S. 218, 233 (1973). A statement such as "go ahead and search" may have a different connotation when it is preceded by an officer's claim that "I have a search warrant to search your house." In that context, such a statement may connote mere acquiescence to the officer's authority rather than voluntary consent. See Bumper, 391 U.S. at 546-50. Further, an officer's claim of lawful authority in this type of situation may amount to a form of coercion, "albeit colorably lawful coercion." Id. at 550. "Where there is coercion there cannot be consent." Id.

While the facts in Bumper, 391 U.S. at 546-47, involved a homeowner's acquiescence to an officer's claim that he had a search warrant, the Supreme Court's holding in that case is not limited to cases where officers falsely or mistakenly claim to have a search warrant. "The 'claim of lawful authority' referred to in Bumper need not involve mention of a search warrant." 3 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 8.2(a), at 641-43 (3d ed. 1994); see, e.g., Johnson v. United States, 333 U.S. 10, 12-13 (1948) (concluding that a hotel guest did not waive her Fourth Amendment rights by

-10-

acquiescing to a search of her room after officers said "I want you to consider yourself under arrest because we are going to search the room"); Orhoraghe v. I.N.S., 38 F.3d 488, 500-01 (9th Cir. 1994) (concluding that an apartment dweller did not voluntarily consent to a search where officers informed him that they did not need a warrant and stated: "Let's go into your apartment."); Bolden v. SEPTA, 953 F.2d 807, 824 (3d Cir. 1991) (en banc) (concluding that an employee did not voluntarily consent to a drug test by acquiescing to the employer's drug-testing policy); Pike v. Gallagher, 829 F. Supp. 1254, 1263 (D.N.M. 1993) (similar).

Taken in context, Sergeant Montano's statement that "we're going to search the house" must be treated as a claim of lawful authority to search the house, including the private bedroom in which Defendant resided. It is not reasonable to infer that Sergeant Montano was referring to a search that did not include Defendant's bedroom when he made the statement that he was *going to* search the house because Sergeant Montano already had directed the other officers to begin searching the rest of the residence, and he knew that such a limited search already was underway when he left the residence to speak with Defendant in his police vehicle.

Immediately after stating "we are going to search the house," Sergeant Montano asked Defendant if the officers were going to find anything *in his bedroom*. This question lends further support to the inference that Sergeant Montano was referring to a search of the entire house, including Defendant's bedroom, when he said: "We are going to search the house."

My determination that Sergeant Montano's statement was a claim of lawful authority also is supported by the fact that, prior to making this statement, consent to search the house

had been sought and received from Defendant's grandparents.  While Defendant was still present in the house, he heard Sergeant Montano request consent to search the residence from Defendant's grandparents.  At the time Sergeant Montano left the residence to speak with Defendant in the police vehicle, the Sergeant also knew that Defendant's grandfather had signed a consent form stating that he authorized the officers to "conduct a *complete* search of my person and/or premises located at 714 Reservoir."[1]  (Ex. 1.) (Emphasis added.) Under these circumstances, it is reasonable to infer that when Sergeant Montano said, "We are going to search the house," he meant--and was understood to mean-- that he already had lawful authority to search the entire house, including Defendant's bedroom, by virtue of the consent granted by Defendant's grandparents.

On these facts, I determine that Defendant's statements and signature on the consent form reflect mere acquiescence to Sergeant Montano's claim of lawful authority to search the entire house, including Defendant's bedroom.  Such acquiescence does not amount to voluntary consent under these circumstances.  Accordingly, the search of Defendant's bedroom does not fall under the exception to the Fourth Amendment's warrant requirement for consensual searches.  See Bumper, 331 U.S. at 548-50.

---

[1] I do not separately analyze whether the consent granted by Defendant's grandfather provided a justification for the search of Defendant's bedroom because both the officers and the Government's counsel conceded at the suppression hearing that the grandfather's consent did not provide such justification.  This argument was abandoned by the Government and is not supported by any evidence in the record.

### B. The Inevitable Discovery Exception

I next consider the Government's alternative argument that the evidence and statements obtained as a result of the warrantless search of Defendant's bedroom should not be excluded because they inevitably would have been discovered by other, lawful means. See Souza, 223 F.3d at 1203-04 (discussing the "inevitable discovery" exception to the warrant requirement). According to the Government, Defendant waived his Fifth Amendment rights under Miranda before he told Sergeant Montano that "coke" was in his bedroom. Under these circumstances, the Government asserts that the officers could have obtained a warrant to search Defendant's bedroom because Defendant's reference to "coke" in his bedroom (combined with the previous information contained in the arrest warrant) gave the officers probable cause to believe that cocaine would be readily discovered therein.

I assume for purposes of analysis that the Government is correct in asserting that Defendant waived his Miranda rights and that his statement about having "coke" in his bedroom, in conjunction with other evidence gathered previously, might have established probable cause for a search. It does not follow, however, that the Government has met its burden of proving all elements of the "inevitable discovery" exception here.

In Souza, 223 F.3d at 1203, the Tenth Circuit stated that "the inevitable discovery exception does not apply in situations where the government's only argument is that it had probable cause for the search." The Souza opinion further noted that:

> "We reject the contention that this doctrine applies where the police had probable cause to conduct a search but simply failed to obtain a warrant .... This court has never applied the inevitable discovery exception so as to excuse

-13-

>a failure to obtain a search warrant where the police had probable cause but simply did not attempt to obtain a warrant . . . . [T]o excuse the failure to obtain a warrant merely because the officers had probable cause and could have obtained a warrant would completely obviate the warrant requirement."

Souza, 223 F.3d at 1203 n.8 (quoting United States v. Mejia, 69 F.3d 309, 319-20 (9th Cir. 1995) (citations and internal quotation marks omitted)).

The rationale for limiting the "inevitable discovery" exception in this manner finds further support in Johnson, 333 U.S. at 13-14:

>The point of the Fourth Amendment . . . is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that these inferences by drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.  Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers.  Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on a proper showing.  The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance.  When the right to privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.

While the Supreme Court has recognized a variety of exceptions to the warrant requirement, these exceptions do not swallow the general rule that law enforcement officers cannot dispense with the warrant requirement simply by relying on their own assessment of probable cause to search a person's home.  See id. at 14-15.

In this case, there is no evidence that any of the officers involved in the arrest of Defendant or the search of his bedroom ever mentioned the possibility of obtaining a search

warrant. There is no evidence that any of these officers took the slightest step toward applying for a search warrant or were prepared to do so. Under these circumstances, Sergeant Montano's testimony at the suppression hearing to the effect that he would have obtained a search warrant if he had not obtained Defendant's signature on the consent form is pure speculation, and I do not find his testimony to be a credible basis on which to apply the inevitable discovery exception.

As there was no effort to obtain a search warrant, and no showing of an exigent circumstance that would have rendered such an effort futile or dangerous, the Government has not met its burden of proving that an exception to the warrant requirement applies here. It follows that the physical evidence and statements obtained after the officers entered the bedroom are subject to the exclusionary rule because they are "fruit of the poisonous tree." See Wong Sun v. United States, 371 U.S. 471, 487-88 (1963); United States v. Erwin, 875 F.2d 268, 269 n.2 (10th Cir. 1989). The Government has made no showing that the evidence and statements in question were obtained by "means sufficiently distinguishable to be purged of the primary taint" of the unlawful search of the bedroom. Wong Sun, 371 U.S. at 487-88. Accordingly, they must be suppressed.

### III. CONCLUSION

Because the Government did not meet its burden of proving that the warrantless search of Defendant's private bedroom satisfied the Fourth Amendment's requirement of reasonableness, and the evidence and statements subsequently obtained by the Government

are tainted by the unlawfulness of the search, such evidence and statements must be suppressed pursuant to the exclusionary rule.

**IT IS, THEREFORE, ORDERED** that *Defendant's Motion to Suppress* [Doc. No. 13] be and hereby is **GRANTED**.

**SO ORDERED** this 15th day of September, 2003, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge

Counsel for the Government:
   **Bill Pflugrath**
   Assistant U.S. Attorney
   Albuquerque, New Mexico

Counsel for Defendant Troy Chavez:
   **Margaret A. Katze**
   Assistant Federal Public Defender
   Albuquerque, New Mexico